**Ancy KURIAN, A Minor, by her P/N/G Elizabeth KURIAN and Kurian Varkey, Appellants,**

**v.**

**Paul ANISMAN, M.D., and Jitendra Shah, M.D., Appellees.**

Superior Court of Pennsylvania.

Argued Feb. 3, 2004.

Filed May 14, 2004.

Christopher J. Culleton, Philadelphia, for appellants.

Regan S. Safier, Philadelphia, for Anisman, appellee.

Deborah M. Knight, Philadelphia, for Shah, appellee.

BEFORE: KLEIN, McCAFFERY, and OLSZEWSKI, JJ.

*Facts and Procedural Posture*

OPINION BY OLSZEWSKI, J.:

¶ 1 On April 5, 2000, a medical malpractice action was instituted on behalf of Ancy Kurian (a minor) against Dr. Paul Anisman, Dr. Jitendra Shah and the Heart Center for Children. A little more than a year later, St. Christopher's Hospital for Children was also made defendant to the action. Plaintiffs/appellants allege that both Dr. Shah and Dr. Anisman diagnosed Ancy with Down's syndrome in 1990, but that both doctors failed to properly evaluate and repair the damage to Ancy's heart and lungs at that time. This failure, it is alleged, has caused young Ancy irreversible pulmonary vascular disease.

¶ 2 On July 21, 2000, a case management order was issued that: 1) listed a discovery deadline for November 5, 2001 and 2) required plaintiffs/appellants to identify all expert witnesses and submit all expert reports by December 3, 2001. Under the case management order, all pretrial motions were to be filed no later than January 7, 2002 and trial was to begin on or around May 6, 2002.

¶ 3 Appellants found they could not comply with the expert witness date. They therefore asked the appellees whether they would agree to an extension of the discovery deadline. Appellees agreed and the deadline was extended until March 15, 2002.

¶ 4 March 15, however, came and went with appellants failing to identify even a single expert and three days later, appellants' counsel petitioned the court for leave to withdraw. This petition was granted by the trial court on April 25, 2002, but not before a trial date was set for July 29, 2002, and Dr. Anisman filed a motion for summary judgment. Further, by that same April 25, 2002 order, the trial court instituted a sixty-day stay of the proceedings so appellants could retain new coun-

sel. With this sixty-day stay, Dr. Anisman's motion for summary judgment was declared moot with leave to re-file after the stay was lifted.

¶ 5 On June 25, 2002 (the expiration date for the 60–day stay), Dr. Anisman re-filed his motion for summary judgment. St. Christopher's followed Dr. Anisman's lead and filed its own motion for summary judgment on June 27.[1] Dr. Shah filed his summary judgment motion on July 16, 2002.

¶ 6 It was not until July 17, 2002, that new counsel entered an appearance for appellants. This date was twenty-three days after the stay expired; twelve days before trial was to begin; and after the filing of all the above motions for summary judgment. Counsel immediately filed a petition for extraordinary relief, seeking ninety days in which to procure expert witness reports. This was denied. Counsel followed this by filing timely responses to the motions for summary judgment and attached with the motion an expert report, prepared by Dr. Alvin J. Chin. Even though the expert report was filed within thirty days of the summary judgment motions, the trial court did not consider the report. The court reasoned that accepting the report this late in the game would cause appellees unfair surprise and prejudice.

¶ 7 Oral arguments concerning the summary judgment motions were heard on July 29, 2002. The trial court found that since the appellants were without any expert witness in this complex medical malpractice case, appellants could not, as a matter of law, prevail on their claim. It therefore granted all motions for summary judgment and dismissed appellants' claims against Drs. Anisman and Shah. Appellants appealed, but because The Heart

Center for Children was still a party in the action, the appeal was quashed.

¶ 8 Appellants did obtain a default judgment against The Heart Center for Children. This judgment, however, was without a finding of liability. To facilitate appeal, the parties and the court agreed that the trial court would enter an order to vacate this judgment and dismiss The Heart Center as a party. That was done and the case can now proceed to appeal.

### Standard of Review

¶ 9 As our high Court has stated, when we review a grant of summary judgment we

> view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Only where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to a judgment as a matter of law will summary judgment be entered. Our scope of review of a trial court's order granting or denying summary judgment is plenary, and our standard of review is clear: the trial court's order will be reversed only where it is established that the court committed an error of law or abused its discretion.

*Pappas v. Asbel,* 564 Pa. 407, 418, 768 A.2d 1089, 1095 (2001) (citations omitted).

### Discussion

¶ 10 We will begin our discussion of this case by disposing of two meritless contentions by appellants. Then we will proceed to the harder question.

---

1. St. Christopher's summary judgment motion went unopposed by appellants and they were dismissed from the lawsuit. Appellant does not challenge this dismissal.

### 1. Whether expert testimony is needed in this medical malpractice lawsuit.

■ ¶ 11 Appellants first argue that even if Ancy's treating physician, Dr. Alvin Chin, may not testify as an expert, Drs. Anisman and Shah have staged a defense where expert testimony is unnecessary. According to appellants, the doctors "informed Ancy's family in 1990 that Ancy needed a catheterization to explore possible congenital heart defects, but that the family failed to return for further treatment." Appellants' brief at 27. Therefore, appellants argue that this case only revolves around the credibility of witnesses and no medical expert is required.

¶ 12 What would happen, though, if the finder of fact were to believe the plaintiffs and find that the doctors never diagnosed the heart defect in 1990? The question would then become whether this failure to diagnose and treat was a deviation from "good and acceptable standards, and that such deviation was the proximate cause of the harm suffered." *Eaddy v. Hamaty,* 694 A.2d 639, 642 (Pa.Super.1997). How could plaintiffs prove this without a medical expert? Drs. Anisman and Shah never admitted to this.

¶ 13 In a complex medical malpractice case such as this, the above burden can only be satisfied by the testimony of an expert medical doctor: the issue is not "so obvious as to be within the range of experience and comprehension of ... lay persons." *Toogood v. Owen J. Rogal D.D.S., P.C.,* 573 Pa. 245, 255, 824 A.2d 1140, 1145 (2003). Expert testimony is clearly needed in this case and appellants' argument to the contrary is meritless.

### 2. Whether Dr. Chin needed to be identified as an expert.

■ ¶ 14 Appellants' second contention is that Dr. Chin's "testimony is exempt from expert disclosure requirements in that he is a treating physician whose opinions were not acquired in anticipation of litigation." Appellants' brief at 23. In support of this argument, appellants cite the Pennsylvania Supreme Court case of *Miller v. The Brass Rail Tavern, Inc.* 541 Pa. 474, 664 A.2d 525 (1995).

¶ 15 In *Miller,* suit was brought against a tavern after Ronald Miller, Jr. was killed in an automobile accident. A central question in the case was the specific time at which Mr. Miller died, and appellants tried to prove this through the testimony of the county coroner. While the coroner had come to a time of death conclusion on the day of the accident and was listed as a witness for the Millers, the trial court found that any determination as to time of death required expert testimony and, since the coroner was not properly listed as an expert witness, his testimony was precluded. Our Supreme Court disagreed. As it stated:

> Coroner Wetzler was not called upon by Appellant or his counsel to determine the facts surrounding Ronald, Jr.'s death. Rather, he had been summoned by the people of Clinton County to carry out the duties of his office. He was notified of the accident at approximately 7:30 a.m. by the County Communications Center, and after conducting an investigation, he made a determination with respect to the time of death. His contact with the accident was completed well before this instant action was initiated.

*Miller,* 541 Pa. at 487, 664 A.2d at 531.

¶ 16 Thus, it was the interplay of two facts that led to the Supreme Court's conclusion in *Miller:* first, the coroner was qualified to render a time of death opinion and second, the coroner came to this opinion in the course of his job responsibilities. His conclusion was obviously not made "in anticipation of litigation."

¶ 17 We agree that, at first blush, the present case does resemble *Miller.* Dr. Chin (Ancy's treating physician) first saw Ancy in 1997. At this time he wrote a report stating:

> An echocardiography report from Dr. Paul Anisman of June 19, 1990 is said to show an ostium primum atrial septal defect, cleft mitral valve, and no patent ductus arteriosus. On reevaluation by Dr. Anisman in 1994 (May 25, 1994) echocardiography revealed a large ductus arteriosus. Cardiac catherization on July 14, 1994 echocardiography revealed a large patent ductus arteriosus and irreversible pulmonary vascular disease.
>
> * * *
>
> As we discussed in our telephone call, Ancy's original problem was apparently missed on Dr. Anisman's echo (June 19, 1990). In other words, for both echocardiography and cardiac catheterization in 1994 to show a large non-restrictive ductus arteriosus, that ductus must have been present in 1990. It was not diagnosed correctly at that time.

¶ 18 The above statements were made by Dr. Chin while acting as Ancy's treating physician; he came to his conclusions without the "anticipation of litigation" being present. These, however, are the *only* statements appellants point to regarding Dr. Chin's feelings on the matter that were not made "in anticipation of litigation." As is evident from the report, Dr. Chin never came to a conclusion as to whether: 1) Dr. Anisman deviated from the standard of care or 2) whether this deviation was a proximate cause of Ancy's injuries. This is hardly surprising. A doctor is concerned with treating his patients, not about whether a prior doctor's breach of a particular standard of care was the factual cause of his patient's injuries. Further, based on the report, it does not appear as if Dr. Chin *could* have come to the conclusions appellants desire; his report shows that he never even looked at the 1990 echocardiography.

¶ 19 The fact that Dr. Chin never came to a pre-anticipation of litigation conclusion as to whether Dr. Anisman breached the physician's standard of care and whether such a breach was the proximate cause of the harm Ancy suffered is fatal to this claim. Without such opinions, appellants have not satisfied their burden of production in this medical malpractice case and are therefore not entitled to any relief on this point.

### 3. Whether Dr. Chin's expert report would, if admitted, establish a genuine issue of material fact.

■ ¶ 20 With these two preliminary bases for relief out of the way, we are almost ready to tackle the difficult question this case presents: whether the trial judge abused her discretion when she rejected Dr. Chin's expert report. Before we do this, we note that the trial court gave alternative reasons for rendering summary judgment against appellants: while she found that accepting the report this late in the day would cause appellees prejudice and surprise, she also found that even if the expert report were allowed, summary judgment would still be proper as the report did not establish a *prima facie* case of medical malpractice against the doctors. We, however, disagree with the judge's latter conclusion.

■ ¶ 21 To establish a cause of action for medical malpractice in Pennsylvania, the plaintiff must show:

> The physician owed a duty to the patient; (2) the physician breached that duty; (3) the breach of the duty was the proximate cause of, or a substantial factor in bringing about the harm suffered by the patient; and, (4) the damages

suffered by the patient were a direct result of the harm. Moreover, the patient must offer an expert witness who will testify to a reasonable degree of medical certainty, that the acts of the physician deviated from good and acceptable standards, and that such deviation was the proximate cause of the harm suffered.

*Eaddy,* 694 A.2d at 642.

¶ 22 Appellee doctors did treat Ancy, therefore, they owed a duty to her. Dr. Chin's expert report takes over from there and establishes the rest of the elements. The report states that: appellees violated the duty owed to Ancy when they allegedly failed to diagnose or treat her heart problems; this failure to act was a proximate cause of Ancy's injuries; appellants violated the standard of care for doctors; and finally, the doctors' violations caused Ancy irreversible injury. Thus, if Dr. Chin's expert report were accepted it would propel the appellants over the summary judgment hurdle.

### 4. Whether the trial judge properly precluded Dr. Chin's expert testimony.

■ ¶ 23 Appellants' main argument is that the trial court committed reversible error when it refused to consider Dr. Chin's expert report. They state that while their expert report was late according to the case management order, the report was filed within thirty days from when they were served with the summary judgment motions. In other words, they argue that the report was a *timely response* to appellees' motions for summary judgment. Since Rule 1035.3(b) gave them thirty days to "supplement" the record in order to defeat a summary judgment motion, appellants argue that the trial court committed error by rejecting their timely, supplemental expert report.[2] In furthering their Rule 1035.3(b) argument, appellants rely heavily on the Pennsylvania Supreme Court plurality opinion *Gerrow v. John Royle & Sons,* 572 Pa. 134, 813 A.2d 778 (2002).

¶ 24 Appellees allege that since *Gerrow* is merely a plurality opinion, it is of no account to the current case. *In the Interest of O.A.,* 552 Pa. 666, 676 n. 4, 717 A.2d 490, 496 n. 4 (1998) (*stating:* "[w]hile the ultimate order of a plurality opinion, *i.e.* an affirmance or reversal, is binding on the parties in that particular case, legal conclusions and/or reasoning employed by a plurality certainly do not constitute binding authority."). In the case before us, however, this assertion is incorrect. *Gerrow* interprets certain rules contained in Pennsylvania's Rules of Civil Procedure. Since these rules are promulgated by our high Court, when we construe a Rule of Civil Procedure our job is to "ascertain and effectuate the intention of the Supreme Court." Pa.R.C.P. 127(a). This alone shows that *Gerrow* is highly informative to our understanding of Rule 1035.3(b). Further, four of the *Gerrow* Justices (the majority) read Rule 1035.3(b) in a manner

---

2. The relevant portions of Rule 1035.3 (response to motion for summary judgment) state:

(a) The adverse party may not rest upon the mere allegations or denials of the pleadings but must file a response within thirty days after the service of the [motion for summary judgment] identifying

. . .

(2) evidence in the record establishing the facts essential to the cause of action or defense which the motion cites as not having been produced.
(b) An adverse party may supplement the record or set forth the reasons why the party cannot present evidence essential to justify opposition to the motion and any action proposed to be taken by the party to present such evidence.

similar to one another.[3] Unmistakably, *Gerrow* is indicative of how our Supreme Court would read and apply Rule 1035.3(b). We will therefore analyze *Gerrow* to determine whether appellants have correctly read Rule 1035.3(b).

¶ 25 In *Gerrow*, the plaintiff sued Shincor Silicones, Inc. on a products liability cause of action. In preparation for trial, a common pleas judge issued a case management order that set December 7, 1998, as the deadline for plaintiff's expert reports and January 4, 1999, as the final date for filing pre-trial motions. Then, two weeks before the expert report deadline was to expire, the parties agreed to extend the discovery deadline. This extension, however, was denied by the judge. Even though the judge denied the extension, the parties continued discovery after the December 7th date.

¶ 26 The January 4, 1999, date was fast approaching. Nevertheless, Gerrow had still not filed an expert report. As the plurality explained:

> Though Appellant Shincor was amenable to continuing discovery beyond the deadline of December 7 and had joined the unsuccessful motion to extend the deadline, Shincor was mindful of the January 4 pretrial motion deadline. To protect its position, Shincor filed a motion for summary judgment on December 31, 1998. The motion was based on the Gerrows' failure to submit expert reports within the time allotted by the case management order, without which the Gerrows could not establish a *prima facie* case due to the technical nature of their negligence claim. Shincor reasoned that, if the trial court later re-

fused to permit untimely filing of expert reports, the court might also refuse to permit untimely filing of pretrial motions, so the motion for summary judgment had to be filed before the January 4 deadline even though Shincor had no objection to the Gerrows continuing their efforts to obtain expert reports.

*Gerrow*, 572 Pa. at 137, 813 A.2d at 780 (plurality opinion).

¶ 27 The Gerrows filed a response to Shincor's summary judgment motion and, along with the response attached an expert report. This expert report would, if accepted, allow the case to proceed to trial. The lower court did not accept this expert report and granted Shincor's motion for summary judgment. Gerrow appealed.

¶ 28 Mr. Chief Justice Zappala's plurality opinion explained that the purpose of the summary judgment rule was to "eliminate cases prior to trial where a party cannot make out a claim or defense after relevant discovery has been completed; the intent is not to eliminate meritorious claims prematurely before relevant discovery has been completed." *Gerrow*, 572 Pa. at 139, 813 A.2d at 781 (*quoting from* the explanatory comments to Pa.R.C.P. 1035.3).

¶ 29 The opinion then went on to broadly state:

> Since the intent of the motion for summary judgment is not to eliminate meritorious claims that could be established by additional discovery or expert report, it is consistent with that intent to permit supplementation of the record under Rule 1035.3(b) to allow the record to be enlarged by the addition of such expert reports. We regard this as being

---

**3.** Chief Justice Zappala wrote the opinion of the court in *Gerrow* with Justices Castille and Newman joining. Justice Saylor wrote a concurrence espousing an almost identical view of Rule 1035.3(b) but declared: "[i]n the ab-

sence of an order imposing preclusive sanctions, Civil Procedural Rule 1035.3(b) grants the non-moving party thirty days to supplement the record in response to a summary judgment motion."

squarely within the scope of the supplementation permitted by Rule 1035.3(b) in response to a motion for summary judgment.

*Gerrow,* 572 Pa. at 140, 813 A.2d at 781–82.

¶ 30 Mr. Justice Saylor's concurrence reiterated this expansive view of 1035.3(b). However, Justice Saylor went on to clarify that: "[i]n the absence of an order imposing preclusive sanctions, Civil Procedural Rule 1035.3(b) grants the non-moving party thirty days to supplement the record in response to a summary judgment motion." *Gerrow,* 572 Pa. at 144, 813 A.2d at 784 (Saylor, J., concurring).

¶ 31 We agree with appellants that a broad reading of *Gerrow* would allow them to attach their expert report as a "supplementation of the record" under Rule 1035.3(b). *Gerrow,* 572 Pa. at 140, 813 A.2d at 782. As we have stated above, the earliest of appellees to motion for summary judgment was Dr. Anisman. Appellants, however, responded to *all* of the summary judgment motions within thirty days and attached a supplemental expert report that, if accepted, would make out a *prima facie* case against all of the appellees.

¶ 32 It must be remembered, however, that there was absolutely no prejudice to the moving party in *Gerrow.* Shincor agreed to extend the expert report deadline and when this was denied by the trial judge, Shincor did not immediately file for summary judgment; rather, they allowed discovery to continue past the December 7th cutoff date. They only moved for summary judgment because they were fearful the lower court judge would act as it did with the expert report deadline and not accept untimely pre-trial motions. *Gerrow,* 572 Pa. at 137, 813 A.2d at 780 (plurality opinion).

¶ 33 That is a far cry from what occurred in the current case. While we are not saying that the facts of this case constitute prejudice *per se,* we are certainly not saying that appellants continual disregard for court orders and deadlines was similar to what occurred in *Gerrow.*

¶ 34 However, does this potential prejudice against the current appellees even matter under *Gerrow?* Although the plurality in *Gerrow* never came right out and said it, we believe that when Rule 4003.5(b) is read in harmony with Rules 1035.3 and 1035.2, it becomes apparent that prejudice must be taken into account in such cases. Thus, when a party makes a timely response to a summary judgment motion and attempts to supplement the record with otherwise untimely expert reports, the court may, on its own motion, determine whether this is allowed under Rule 4003.5(b).[4] In so doing, however, the

---

4. We will restate Rule 4003.5 sections (a) & (b).

Rule 4003.5. Discovery of Expert Testimony. Trial Preparation Material.
(a) Discovery of facts known and opinions held by an expert, otherwise discoverable under the provisions of Rule 4003.1 and acquired or developed in anticipation of litigation or for trial, may be obtained as follows:
(1) A party may through interrogatories require
(a) any other party to identify each person whom the other party expects to call as an expert witness at trial and to state the subject matter on which the expert is expected to testify and
(b) the other party to have each expert so identified state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion. The party answering the interrogatories may file as his or her answer a report of the expert or have the interrogatories answered by the expert. The answer or separate report shall be signed by the expert.

. . .

(b) An expert witness whose identity is not disclosed in compliance with subdivision

court must apply the long-standing prejudice standard found in the caselaw construing Rule 4003.5(b).

¶ 35 Appellants argue that Rule 4003.5(b) preclusion is a sanction and is thus permissible only "on motion." The trial court may not, they continue, preclude a witness's testimony in the absence of the other party motioning the court to do so. Appellants' argument thus seems follow Justice Saylor's concurrence in *Gerrow*. As the Justice states:

> while the trial courts are authorized to preclude evidence as a sanction for violation of an order of court respecting discovery, such a preclusionary order presently is permissible only "on motion." ... In the absence of an order imposing preclusive sanctions, Civil Procedure Rule 1035.3(b) grants the non-moving party thirty days to supplement the record in response to a summary judgment motion.

*Gerrow*, 572 Pa. at 144, 813 A.2d at 784 (Saylor, J., concurring).

¶ 36 Rule 4003.5(b), however, has no articulated requirement that its remedy be in response to a motion. Seeing this, Justice Nigro wrote a dissent in *Gerrow* that attacked his brethren's above statement. According to Justice Nigro, Justice Saylor read the procedural requirements found in Rule 4019 and unnecessarily juxtaposed the "on motion" language onto Rule 4003.5. *Gerrow*, 572 Pa. at 151–52, 813 A.2d at 789 (Nigro, J., dissenting).

¶ 37 We think Justice Nigro is correct in this differentiation between Rules 4019(i) and 4003.5(b). These are two separate rules with separate requirements. This is made clear in the Explanatory Comments to Rule 4003.5. The comments declare:

> (a)(1) of this rule shall not be permitted to testify on behalf of the defaulting party at the trial of the action. However, if the failure to disclose the identity of the witness

If the answering party or the expert does not fully comply with the foregoing, the court under subdivision (b) or (c) may exclude or limit the testimony of such expert if offered at the trial. *Sanction Rule 4019(i) also provides an independent sanction*, excluding the testimony of a witness whose identity has not been revealed.

Pa.R.C.P. 4003.5 (explanatory comments) (emphasis added).

¶ 38 Justice Nigro explained the matter as follows:

> The motions contemplated in Rule 4019(a)(1) are typically motions to compel discovery during the discovery period, such as motions to compel answers to interrogatories or document requests, motions to compel the identification of a corporate designee, and motions to compel witnesses to appear at deposition. ... It is self-evident that such issues, which arise while the parties are independently conducting discovery, require the filing of a motion in order to obtain the court's attention.

*Gerrow*, 572 Pa. at 151 n.8, 813 A.2d at 789 n.8 (Nigro, J., dissenting).

¶ 39 Moreover, we note that the public policy argument favors Justice Nigro's view. When determining whether a witness's testimony should be precluded, the trial court is not *solely* concerned with the prejudice to the parties. Most prejudice can be cured with trial delay, and any harm to the opposing party as a result of the delay can be cured with an award of attorney's fees. We must also weigh the effect of any delay on the just and speedy resolution of cases in our overburdened court system. Giving the trial judge the

> is the result of extenuating circumstances beyond the control of the defaulting party, the court may grant a continuance or other appropriate relief.

ability to preclude testimony on its own motion satisfies this concern.

¶ 40 Appellees never did file any motion to exclude Dr. Chin's testimony. Rather, they filed motions for summary judgment alleging that appellants failed to "produce evidence of facts essential to the cause of action." Pa.R.C.P. 1035.2(2). Within thirty days, appellants then responded to the motions and attached an expert witness report that, if accepted, would "produce" these essential facts. If the trial judge did, in fact, use Rule 4003.5 to preclude Dr. Chin's testimony, it did so on its own. As stated above, we agree that this is permissible under the rule and within the judge's discretion.

¶ 41 It must be stressed that even though Rule 4003.5(b) does not require a party to motion the court before the trial judge may exclude a witness's testimony, if a motion is *in fact* filed seeking to preclude a witness's testimony, this filing is, in and of itself, relevant to the "prejudice" determination. This is because whenever a party moves to exclude the witness's testimony, the moving party is telling the court that it would be prejudiced if that witness were allowed to testify at trial. The filing is thus relevant as to whether the moving party is, in fact, being prejudiced by the other party's failure to correctly identify the witness.

¶ 42 The question then becomes: can a trial court use its Rule 4003.5(b) discretion and preclude expert testimony *even after* the other party has filed a motion for summary judgment? We see no reason why it cannot.

¶ 43 Rule 4003.5(b) seems to give the trial court discretion to preclude expert trial testimony *at any pre-trial date* when the expert's "identity is not disclosed in compliance with [Rule 4003.5(a)(1).]." Pa. R.C.P. 4003.5(b). Here, appellants only identified Dr. Chin in their response to the summary judgment motion. Neither the court nor appellees even knew Dr. Chin was going to be an expert *until* appellants responded to the motion. Thus, it was only *after* the summary judgment motions were filed that the court could even analyze whether Rule 4003.5(b) mandated preclusion of the doctor's expert testimony. How can we say Rule 4003.5(b) allows the trial court to preclude unidentified expert testimony, only not when the testimony is introduced to supplement the record in opposition to a summary judgment motion?

¶ 44 To permit appellants' broad reading of *Gerrow* and require that this expert report be admitted just as long as it was filed within thirty days of the summary judgment motion would take away the very discretion Rule 4003.5(b) gives to the trial court and make a mockery of court orders and court-imposed deadlines. Further, and importantly, appellants reading would open wide a door closed by Rule 4003.5(b) and allow the very things Rule 4003.5(b) seeks to prevent: unfair surprise and prejudice.

¶ 45 We have thus found that the trial court's procedures were correct in this case. By granting appellees' summary judgment motions, the court acted as follows: 1) appellants did not identify their expert in accordance with Rule 4003.5(a)(1); 2) because of this failure, the trial court acted pursuant to the discretion given to it by Rule 4003.5(b) and would not permit the witness to testify at trial; 3) since the 4003.5(b) ruling precluded the expert from testifying at trial, appellants cannot introduce their expert report to defeat summary judgment; 4) the failure of appellants to supplement their pleading results in their being unable to "produce evidence of facts essential to the cause of action"; and, 5) summary judgment is thus proper.

¶ 46 As stated above, however, prejudice must be determined by the trial court before an expert's testimony may be excluded. This preclusion of testimony is "a drastic sanction, and it should be done only where the facts of the case make it necessary;" the prejudice may not be assumed. *Kemp v. Qualls,* 326 Pa.Super. 319, 473 A.2d 1369, 1374 (1984). We have declared:

> Assuming that a party has not acted in bad faith and has not misrepresented the existence of an expert expected to be called at trial, no sanction should be imposed unless the complaining party shows that he has been prejudiced from properly preparing his case for trial as a result of the dilatory disclosure.

¶ 47 In the current case, the trial court found that appellees were in fact prejudiced by appellants' late identification of Dr. Chin as an expert witness. The reasons given by the trial court for this preclusion were: 1) appellants continually violated court ordered deadlines, and 2) the acceptance of this expert witness report on the day the parties were supposed to go to trial would cause appellees unfair surprise and prejudice.

¶ 48 As the trial court found, and as appellees argued, had it allowed appellants' expert report at such a late stage, appellees would be "left with no time to evaluate and respond to the expert testimony." Appellants counter that appellees had notice of Dr. Chin's testimony since he was Ancy's treating physician and had submitted an evaluation report. The fact remains, however, that Dr. Chin never rendered a highly critical opinion concerning the appellees until he wrote his expert report. Appellees were therefore not put on notice of Dr. Chin's import or his damning opinions until the eve of trial. Because of this, the court found that appellees would have had no time to prepare for Dr. Chin's testimony or be able to raise any additional defenses to Dr. Chin's opinions.

¶ 49 The only way this prejudice could be neutralized is if the trial court delayed the trial date yet again. However, as the trial court stated, any additional delay "would disrupt the efficient and just administration of justice and would send a blatant message that case management deadlines are meaningless." We agree. While our Supreme Court has made clear the fact that local rules, such as Philadelphia's case management system, must take a backseat to our Rules of Civil Procedure, these deadlines are far from meaningless. They are *court orders*. When these deadlines are violated with impunity, as was done by the plaintiffs in this case, the abusing party must be prepared to pay the consequences. Usually the consequences are less than what occurred here, an order which effectively dismisses the lawsuit. Yet, when the other party suffers prejudice because of the unjustified delay, this result is proper and is in accordance with Pennsylvania's Rules of Civil Procedure.

¶ 50 In conclusion, we believe that the trial judge used her discretion wisely and affirm the order of summary judgment.

¶ 51 Order AFFIRMED.